**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MILKO V. MATEO,

                Plaintiff,

    v.

FIRST TRANSIT INC.,

                Defendant.

Civ. Action No. 19-17302 (FLW)

**OPINION**

**WOLFSON, Chief Judge**:

Before the Court is defendant First Transit Inc.'s ("Defendant") Motion to Dismiss plaintiff Milko Mateo's ("Plaintiff") Second Amended Complaint ("SAC"). Plaintiff's SAC asserts claims for wrongful discharge under *Pierce v. Ortho Pharmaceutical Corporation*, 84 N.J. 58 (1980), and hostile work environment in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq*. Defendant contends that both of Plaintiff's claims are untimely and that his NJLAD claim fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff has opposed the Motion. Because I conclude that both of Plaintiff's claims are timely and that he adequately states an NJLAD claim, Defendant's Motion is **DENIED**.

## I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant facts are derived from Plaintiff's SAC and assumed as true for the purposes of this motion.

Defendant is a corporation with its headquarters in Ohio, and it operates a bus company that conducts business at Rutgers University in New Brunswick, New Jersey. ECF No. 37 ¶2. Defendant hired Plaintiff as a bus driver on August 20, 2015. *Id.* ¶3.

On February 15, 2016, Plaintiff discovered a defective windshield defroster on the bus he was driving that night. ECF No. 37 ¶5-6. Due to the limited visibility, Plaintiff had to drive with one hand while wiping off the windshield with his other hand. *Id.* ¶6. Plaintiff then placed the bus out of service due to his concern that the defective defroster created a safety risk, and thereafter, notified his supervisor, Kim Hale. *Id.* ¶¶5, 7. Mr. Hale allegedly told Plaintiff to continue driving the bus and picking up passengers, to which Plaintiff objected. *Id.* ¶7. Plaintiff alleges that driving the bus in this condition violated certain Department of Transportation (DOT) safety regulations related to defogging systems. *Id.* ¶8. On February 16, 2016, Plaintiff was written up for insubordination by "Mr. Kelly," who was apparently an employee of Defendant. *Id.* ¶10.

Shortly thereafter, Plaintiff alleges that Defendant took certain actions to deprive Plaintiff of access to bus routes. On February 23, 2016, Plaintiff alleges that he inquired about a posting for an open route, at which point the posting listed only three names. *Id.* ¶12. Upon his inquiry, Plaintiff alleges that Jose Vega, a member of Defendant's management team, removed the posting and "changed it to the route that was going to be given to the same driver who was driving that morning." *Id.* Plaintiff alleges that Mr. Vega took similar actions on March 2, 2016, and April 8, 2016, removing route postings after Plaintiff inquired into their availability, allegedly "to keep the routes from going to Plaintiff." *Id.* ¶13. Plaintiff alleges that he was the only driver subjected to these actions. *Id.*

Plaintiff alleges that he reported or objected to several other safety violations during his employment with Defendant. For example, on August 30, 2016, Plaintiff reported a power outage on a bus he was driving, which Defendant allegedly ignored. *Id.* ¶14. Additionally, on several

occasions during the summer and fall of 2016, Plaintiff called "Ethics[ P]oint," Defendant's hotline for safety issues, to report certain violations, including: a student who fell out of his wheelchair after a bus driver slammed on the brakes; drivers driving at night with defective headlights; and buses with defective exhaust systems, which allegedly were not fixed following Plaintiff's complaints. *Id.* Plaintiff also objected, during the summer of 2016, to driving a bus with a defective fuel gauge, which Defendant concluded did not give rise to an issue. And, on January 12, 2017, Plaintiff noticed a slashed tire on the bus to which he was assigned, but safety supervisor George Oshiapem allegedly told Plaintiff that another driver had driven the bus in the same condition that day, and that Plaintiff should drive the bus, as well. *Id.*

After complaining about these incidents, Plaintiff alleges that Defendant retaliated against him with "harassing behavior and refusal to give him work [or] routes." *Id.* ¶15. On September 23, 2016, Mr. Oshiapem gave Plaintiff a "coaching session" in response to an incident in which Mr. Oshiapem claimed that Plaintiff cut too close to pedestrians and another vehicle at a red light, triggering a camera on the bus Plaintiff was driving. *Id.* ¶16. However, Plaintiff alleges that, on the night of September 22, 2016 at 9:11 p.m., at the intersection where the incident occurred, there were no pedestrians, and the bus never came close to any other objects. Plaintiff alleges that this is an example of the incidents that Defendant "manufactured" in order to retaliate against Plaintiff for reporting safety violations. *Id.*

Plaintiff also avers that "Defendant fabricated a fraudulent written warning [d]ocument" alleging that a bus Plaintiff operated on October 24, 2016, had an "inner shredded tire." *Id.* ¶18. According to Plaintiff, the employee who reported the shredded tire would not have been able to see the tire in question based on the position from which he observed the tire. *Id.* ¶27. Plaintiff further contends that the written warning he received contradicted the report with respect to the time

at which the shredded tire was observed. *Id.* ¶28-29. Plaintiff alerted Ethics Point about this incident. *Id.* ¶33.

Plaintiff is a gay male, and he alleges that during 2016, "several derogatory words for homosexuals were used freely throughout the work floor, including but not limited to the word 'faggot.'" *Id.* ¶60. On February 16, 2016, Plaintiff alleges that Maria Thomas, an employee of Defendant, asked Plaintiff why he had been yelling the word "faggot" at Mr. Hale, to which Plaintiff responded that he had been speaking about a "foggy" windshield. *Id.* ¶61. Plaintiff alleges that Ms. Thomas made this mistake "due to this slur being used constantly in the workplace." *Id.* During the summer of 2016, Plaintiff also overheard a radio conversation between Mr. Hale and a driver, Mr. Maha, in which Mr. Maha yelled the word "faggot" at Mr. Hale. *Id.* ¶63. Plaintiff alleges that this incident was never addressed and that Mr. Maha was never reprimanded, which made Plaintiff "feel very uncomfortable." *Id.*

Plaintiff also alleges that certain employees made sexual advances toward him during the summer of 2016. In one instance, a driver—Mr. Waheeve—"kept asking Plaintiff for sexual favors," which Plaintiff reported to the Equal Employment Opportunities Commission (EEOC). *Id.* ¶62. In another incident, a driver made sexual advances toward Plaintiff, and when Plaintiff ignored the driver, he made a derogatory comment to Plaintiff about his anatomy. *Id.* ¶64.

Plaintiff alleges that he reported the incidents involving derogatory slurs and alleged sexual advances to Ethics Point in October 2016. *Id.* ¶¶62, 65. In response, Plaintiff alleges that Defendant retaliated against him due to his sexual orientation and his reports to the EEOC and Ethics Point by denying him driving shifts and imposing "other acts of hostility," as described *supra*,[1] which he alleges created a "hostile work environment." *Id.* ¶¶67-68.

_____

[1] Although the SAC does not specify these "other acts of hostility," it refers to them as other acts "described above," which includes the allegedly fabricated safety warnings against Plaintiff in

Plaintiff alleges that he worked through April 30, 2017, the end of the spring semester. *Id.* ¶38. Starting on May 1, 2017, which was the first day of the summer semester, Plaintiff alleges that Defendant refused to assign him any bus routes, resulting in a lack of work and income for Plaintiff and commencing a "constructive discharge process." *Id.* ¶39. In June 2017, Plaintiff met with Mr. Oshiapem for a "turning and maneuvering" evaluation, during which Mr. Oshiapem purportedly did not execute the evaluation as intended. *Id.* ¶40. That month, Emmanuel Wayne—the chairman of Plaintiff's union—held a meeting with Plaintiff and employees of Defendant to discuss Plaintiff's complaints and the shredded tire incident, but apparently no issues were resolved. *Id.* ¶41. According to the SAC, Defendant thereafter continued to deny Plaintiff routes, leaving him without work. *Id.* ¶42.

In August 2017, Plaintiff spoke by phone and email with Brad Byers, an employee with Defendant's human resources department, to address Defendant's retaliatory actions. *Id.* ¶43. Mr. Byers asked why Plaintiff was not working, and Plaintiff explained that Defendant refused to assign him any bus routes in response to his complaints to Ethics Point. *Id.* ¶44, 46. Then, Plaintiff requested a copy of the route schedule for the upcoming fall semester as well as his employment history, neither of which were, allegedly, provided. *Id.* ¶¶45, 47.

On September 5, 2017, Plaintiff emailed Mr. Byers regarding the status of his warning related to the shredded tire and requested that Defendant rescind the warning and restore Plaintiff's normal work schedule. *Id.* ¶49. Defendant allegedly did not take any action in response to these requests. *Id.* Plaintiff also avers that, during his interactions with Mr. Byers, he provided information related to his previous complaints, and that Mr. Byers did not take any action in response. *Id.* ¶52.

_____

September and October 2016. ECF No. 37 ¶67.

Plaintiff claims that "[a]fter these meetings it was clear that the retaliation would not stop" and that "[a]ll other drivers received routes for the summer and fall semesters except [Plaintiff]." *Id.* ¶53. Plaintiff alleges that he "was constructively discharged on September 5, 2017," as it was "clear by that date that the defendant would not address his complaints [or] give him any routes." *Id.* Plaintiff notified Defendant on September 5, 2017, of his understanding that he had been constructively discharged based on Defendant's failure to assign him any routes during the summer and fall 2017 semesters. *Id.* On September 11, 2017, Mr. Byers emailed Plaintiff that he had received Plaintiff's "email expressing his safety concerns" and thanked Plaintiff for his past service with Defendant. *Id.* ¶54.[2] Plaintiff alleges that Defendant's actions caused him emotional distress, depression, anxiety, and emotional anguish, and that he was diagnosed with posttraumatic depression and bipolar manic disorder in April 2020. *Id.* ¶69.

Plaintiff filed his initial Complaint in this Court on August 28, 2019, and an Amended Complaint on December 17, 2019, both *pro se*. ECF Nos. 1, 10. Following Defendant's Motion to Dismiss the Amended Complaint, ECF No. 20, the Court issued an Opinion dismissing certain claims with prejudice, but giving Plaintiff leave to file a second amended complaint with respect to his NJLAD, common law fraud, and *Pierce* public policy claims. ECF No. 27. Plaintiff thereafter retained counsel and filed his Second Amended Complaint, alleging claims under *Pierce* and the NJLAD. ECF No. 37. On January 11, 2021, Defendant filed its Motion to Dismiss the SAC for failure to state a claim pursuant to Rule 12(b)(6). ECF No. 38. Plaintiff filed his Opposition on February 5, 2021, ECF No. 42, and Defendant filed its Reply on March 4, 2021. ECF No. 43.

---

[2] Although not alleged in the SAC, Plaintiff attached, as an exhibit to his Opposition brief, the final "Earnings Statement" he received from Defendant on September 22, 2017. ECF No. 42-2. The Earnings Statement covers the period between September 3 and September 16, 2017, and it includes only holiday pay during that period; no regular pay for that period is included. *Id.*

## II.     LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).  While Federal Rule of Civil Procedure 8(a)6 does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly* and *Iqbal*, courts within this Circuit engage in a three-step progression.  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id*.  Finally, where "there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

### A.   *Pierce* Claim

Plaintiff first alleges, under *Pierce*, that he was unlawfully discharged after objecting to, or refusing to participate in, unsafe practices that he viewed as violations of federal regulations and public policy. Defendant argues that Plaintiff's *Pierce* claim is barred by the statute of limitations. For the reasons which follow, I conclude that Plaintiff has satisfied the statute of limitations under *Pierce*.[3]

The parties do not dispute that Plaintiff's *Pierce* claim is subject to a two-year statute of limitations. *See* ECF No. 38-1 at 12; ECF No. 42 at 18 (arguing that Plaintiff's *Pierce* claim, filed on August 28, 2019, satisfies the statute of limitations because he was discharged on September 5, 2017); N.J.S.A. 2A:14-2 (establishing two-year statute of limitations for tort claims); *Day v. Wells Fargo & Co.*, Civ. No. 17-6237, 2018 WL 1891476, at *4 (D.N.J. Apr. 20, 2018) (finding plaintiff's *Pierce* wrongful termination claim sounds in tort and is subject to two-year statute of limitations). The parties also do not appear to dispute that Plaintiff's *Pierce* wrongful termination claim accrued on the date of his discharge. *See* ECF No. 38-1 at 13-14; ECF No. 42 at 18 (describing accrual date as the date of Plaintiff's "final constructive discharge"); *Day*, 2018 WL 1891476, at *4 (concluding plaintiff's *Pierce* wrongful termination claim "accrued" on the "date of her alleged constructive termination").

Rather, the parties dispute only the date on which Plaintiff was discharged. Plaintiff alleges that he was discharged at the earliest on September 5, 2017, which is the day he notified Defendant of his perceived constructive discharge and departure from the company. ECF No. 42 at 18. Because

---

[3] Defendant has not contested the merits of Plaintiff's *Pierce* claim. Accordingly, in this Opinion, I only address Defendant's argument that Plaintiff's *Pierce* claim is untimely.

Plaintiff filed his initial Complaint on August 28, 2019, he argues that his Complaint is timely.[4] Defendant argues that Plaintiff was constructively discharged on May 19, 2017, which is the day he received his last regular paycheck. ECF No. 38-1 at 14.

Defendant relies primarily on the Supreme Court of New Jersey's holding in *Alderiso v. Medical Center of Ocean City*, 167 N.J. 191 (2001), for the proposition that "the date of discharge means the last day for which an employee is paid her regular wage or salary, notwithstanding her absence from work on that date." *Id.* at 199.[5] In *Alderiso*, the defendant notified the plaintiff—a registered nurse—that she was being discharged for poor performance and requested that she report to work the following day to close out her files. *Id.* at 195. The plaintiff did not report to work the following day, but the defendant paid the plaintiff her regular salary through the day following the date she received notice of her termination. *Id.* The Court explained that whether the plaintiff's complaint was timely depended on whether her claim accrued on "(1) the date . . . she received notice of termination, (2) the last day for which she was actually paid, or (3) the first day on which she was unemployed." *Id.* at 198. The Court concluded that the plaintiff's claim accrued on the last day for which she was paid, making her complaint untimely. *Id.* at 199. In reaching that conclusion, the Court rejected the argument that the claim accrued on the date the plaintiff received notice of her termination, because the defendant had executed an unemployment insurance form indicating that the plaintiff was discharged on the last day she received her regular salary. *Id.* The Court clarified,

---

[4] In my Opinion addressing Defendant's first Motion to Dismiss, I concluded that the Court will analyze the statute of limitations period based on the date Plaintiff filed his initial Complaint. ECF No. 27.

[5] *Alderiso* was decided under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, which protects against termination in retaliation for reporting violations of law or public policy. However, courts have applied *Alderiso*'s holding regarding the accrual date of a statute of limitations to a *Pierce* wrongful termination claim. *Day*, 2018 WL 1891476, at *4.

however, that "the date of discharge for limitations purposes does not include any subsequent date on which severance, health, or other extended benefits are paid." *Id.* (citing *Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 191-92 (3d Cir.1977)).

Contrary to Defendant's contentions, *Alderiso* is distinguishable and does not govern this case. In *Alderiso*, the defendant had already notified the plaintiff of her termination before paying her last paycheck. *Id.* at 195. Thus, whether the plaintiff had been discharged on the day she received her final paycheck was not in question. Here, other than refusing to assign routes to Plaintiff without any explanation, thereby depriving Plaintiff of his hourly wages, Defendant provided no notice that Plaintiff had been discharged until September 11, 2017, the date Mr. Byers responded to Plaintiff's September 5, 2017 email notifying Defendant of his constructive termination. In fact, between May 19 and September 5, 2017, Defendant continued to act in a way that allegedly demonstrated Plaintiff's continued employment. According to the SAC, in June 2017, Mr. Oshiapem administered a turning and maneuvering evaluation to Plaintiff at one of Defendant's facilities. ECF No. 37 ¶40.[6] That same month, the chairman of Plaintiff's union allegedly held a meeting with Plaintiff and certain general managers employed by Defendant to discuss Plaintiff's complaints and the shredded tire incident. *Id.* ¶41. "Nothing was resolved at this meeting." *Id.* Following this meeting, Plaintiff continued seeking routes, but he was continually denied. *Id.* ¶42. In August 2017, Plaintiff corresponded with Mr. Byers by phone and email. *Id.* ¶43. Mr. Byers allegedly inquired why Plaintiff had not been working and why Defendant would retaliate against him, but based on Plaintiff's allegations, there is no indication that Mr. Byers communicated to Plaintiff that he had been terminated. *Id. Id.* ¶¶44-46. Mr. Byers did not communicate his understanding that Plaintiff had been

---

[6] Plaintiff's Earnings Statement for the pay period ending September 16, 2017, suggests that Plaintiff was in fact paid for attending this evaluation. ECF No. 42-2 at 1 (documenting that Plaintiff was paid $42.00 for attending a "Safety Meeting" and $20.02 for attending a "Safety Training").

terminated until September 11, 2017, when Mr. Byers thanked Plaintiff for his past service with Defendant. *Id.* ¶54.

This conclusion is buttressed by the Supreme Court of New Jersey's decision in *Roa v. Roa*, 200 N.J. 555 (2010). There, the Court confirmed that "a discharge is a discrete discriminatory act that places an employee on notice of the existence of a cause of action and of the need to file a claim." *Id.* at 569. While *Roa* concerned the accrual of a retaliatory termination claim under the NJLAD, its reasoning is equally applicable to Plaintiff's wrongful termination claim under *Pierce*. In *Roa*, the plaintiff sought to assert a wrongful termination claim under a "continuing violation theory," which "was developed to allow for the aggregation of acts, each of which, in itself, might not have alerted the employee of the existence of a claim, but which together show a pattern of discrimination." *Id.* The plaintiff had been terminated outside the limitations period, but he argued that the subsequent denial of unemployment benefits in connection with his termination, which occurred within the limitations period, made his retaliatory termination claim timely. *Id.* at 569-70. The Court held that the plaintiff's claim was untimely because "when [the plaintiff] was fired[,] he clearly knew, or should have known, that he had been the subject of retaliation by defendants, and should have filed his complaint within two years thereof." *Id.* at 570. Thus, under *Roa*, notice of termination is highly relevant for purposes of establishing the accrual date of a wrongful discharge claim.

Here, for the reasons discussed *supra*, Plaintiff was not on notice of his discharge until at least September 5, 2017, when he communicated to Mr. Byers that, due to Defendant's continuous refusal to assign him any routes during the summer of fall of 2017, he had been constructively discharged. Notably, Defendant does not argue that Plaintiff was, or should have been, on notice of his termination on May 19, 2017, or at any time before September 5, 2017. Defendant merely contends that "*Alderiso* does not limit itself to situations where an employee receives notice of his termination." ECF No. 43 at 8. However, *Alderiso* simply had no occasion to consider the issue of

notice, as the plaintiff was given notice of her termination before receiving her final paycheck.

Moreover, Plaintiff was paid an hourly wage, not a regular salary. Thus, whether he received his "regular" paycheck depended on whether his supervisors assigned bus routes to him on a regular basis. If mere receipt of what turns out to be a plaintiff's final paycheck, without further notice of termination, is sufficient to trigger the statute of limitations in a wrongful termination claim, employers could—as evidently occurred here—simply stop assigning employees any work, stringing them along while the statute of limitations runs without providing any indication that the employee has in fact been terminated.

Accordingly, I conclude that the statute of limitations applicable to Plaintiff's wrongful discharge claim accrued on September 5, 2017, the date he sent his notice of constructive discharge. Thus, Plaintiff's *Pierce* claim, filed on August 28, 2019, was timely.

**B.      NJLAD Claim**

Plaintiff's second claim alleges that Defendant created a hostile work environment that led to Plaintiff's ultimate discharge, in violation of the NJLAD. Specifically, Plaintiff alleges that Defendant's employees freely used homophobic slurs in the workplace and that Plaintiff was subject to unwanted sexual advances accompanied by derogatory language. Plaintiff further alleges that Defendant retaliated against him after he lodged complaints related to these incidents with the EEOC and through Defendant's system for reporting ethics violations. Defendant contends that Plaintiff's NJLAD claim is untimely and otherwise fails to state a claim. Because I conclude that Plaintiff's claim satisfies the statute of limitations and states a hostile work environment claim under the NJLAD, Defendant's Motion to Dismiss Plaintiff's NJLAD claim is denied.

1.      Plaintiff's NJLAD Claim Satisfies the Statute of Limitations

Claims under the NJLAD are subject to a two-year statute of limitations. *Montells v. Haynes*, 133 N.J. 282, 292 (1993). In determining the accrual date, the Supreme Court of New Jersey has

adopted the approach that the U.S. Supreme Court announced in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) with respect to claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Shepard v. Hunterton Developmental Ctr.*, 174 N.J. 1, 20-21 (2002). In *Morgan*, the Court held that for "discrete discriminatory acts," such as "termination, failure to promote, denial of transfer, or refusal to hire," the statute of limitations begins to run on the day the act occurs. 536 U.S. at 110, 114. In contrast, for claims alleging a hostile work environment, the employee may satisfy the statute of limitations by filing his complaint within the requisite time period running from the day of any act that comprises the hostile environment. *Id.* at 118. The Court adopted this rule because a hostile work environment "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 115.

Applying *Morgan* to claims under the NJLAD, *Shepard* developed the following approach: first, if the plaintiff has alleged "one or more discrete acts of discriminatory conduct[,] . . . then [his or her] cause of action would have accrued on the day on which those individual acts occurred"; second, if the plaintiff has "alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment[,] . . . then [his or her] cause of action would have accrued on the date on which the last act occurred, notwithstanding 'that some of the component acts of the hostile work environment [have fallen] outside the statutory time period.'" *Shepard*, 174 N.J. at 21 (quoting *Morgan*, 536 U.S. at 117). Courts refer to the second prong of this approach as the "continuing violation theory." *Roa*, 200 N.J. at 569. In *Roa*, the Court clarified that the continuing violation theory does not permit plaintiffs to "aggregate[e] . . . discrete discriminatory acts for the purpose of reviving an untimely act of discrimination that the victim knew or should have known was actionable." *Id.* "Each such 'discrete discriminatory act starts a new clock for filing charges alleging that act.'" *Id.* at 569-70 (quoting *Morgan*, 536 U.S. at 113).

Here, Plaintiff has "alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment." *Shepard*, 174 N.J. at 21. Plaintiff alleges that, during 2016, "several derogatory words for homosexuals were used freely through the work floor, including by not limited to the word 'faggot.'" ECF No. 37 ¶60. He alleges particular examples of the use of the word "faggot," including a bus driver, Mr. Maha, yelling that word at Mr. Hale over Defendant's radio system. *Id.* ¶63. Plaintiff also alleges that two different drivers made sexual advances toward him during the summer of 2016. One of those drivers—Mr. Waheeve—made continuing advances, and the other "made a derogatory comment to [Plaintiff] about his anatomy" after Plaintiff ignored the driver. *Id.* ¶¶62, 64. Plaintiff reported the incident involving Mr. Waheeve to the EEOC, and he reported the use of derogatory slurs and the sexual advances to Ethics Point. *Id.* ¶¶62, 65. Thereafter, Plaintiff alleges that Defendant retaliated against him by denying him shifts and imposing "other acts of hostility," thereby creating a hostile work environment. *Id.* ¶¶66-68. Plaintiff refers to the "other acts of hostility" as those "described above" in his SAC, which includes Defendant's alleged fabrication of safety infractions against Plaintiff in September and October 2016. *Id.* ¶¶16-18, 32. Plaintiff also alleges that he was denied bus routes beginning on May 1, 2017, and that Defendant continued to deny him any routes during the summer and fall of 2017. *Id.* ¶¶38, 42, 45, 49. Taken together, the derogatory slurs, sexual advances, and retaliatory actions taken in response to Plaintiff's complaints regarding these incidents, state a claim for hostile work environment. That environment persisted through Defendant's denial of bus routes in September 2017 and Plaintiff's corresponding notice of constructive discharge.

Defendant's arguments to the contrary are unpersuasive. First, Defendant's contention that the final allegation related to Plaintiff's hostile work environment claim occurred in the summer of 2016 is inconsistent with Plaintiff's allegations. ECF No. 38-1 at 14. Rather, Plaintiff alleges that Defendant's retaliatory actions in response to his EEOC and Ethics Point complaints pertaining to

the use of derogatory slurs and sexual advances, including the denial of bus routes, continued during the summer and into the fall of 2017. *See* ECF No. 37 ¶¶38, 41-42, 49; *see also Shepard*, 174 N.J. at 21-22 (considering retaliatory actions taken after plaintiffs complained about a racially hostile work environment to all comprise the hostile environment underlying the plaintiffs' NJLAD claim).

Second, to the extent that Defendant argues in the context of Plaintiff's NJLAD claim that Plaintiff has merely alleged "discrete" acts, which Plaintiff may not "aggregate[e] for the purpose of reviving an untimely act of discrimination," *Roa*, 200 N.J. at 569, that argument is without merit. *Morgan* described "discrete discriminatory acts" as including "termination, failure to promote, denial of transfer, or refusal to hire." 536 U.S. at 114. Here, only Plaintiff's ultimate termination in September 2017 would qualify as a discrete act under *Morgan*. Yet, Plaintiff bases his hostile work environment claim on the cumulative effects of the derogatory slurs, sexual advances, and retaliatory actions—including route denials—allegedly taken in response to Plaintiff's complaints regarding these incidents. ECF No. 37 ¶¶67-68 (noting that "[a]fter these such complaints [related to the derogatory slurs and sexual advances], as well as the previously mentioned safety complaints, plaintiff was retaliated against by not receiving shifts and other acts of hostility as described above[,]" which "created a hostile work environment").

Thus, Plaintiff's "cause of action accrued on the date of the last act in the pattern or series of acts that comprise the continuing violation claim." *Shepard*, 174 N.J. at 21-22. Here, that date is September 5, 2017, when Plaintiff alleges that he requested the reinstatement of his routes a final time, in response to which Defendant took no action, leading Plaintiff to submit notice of his perceived discharge. ECF No. 37 ¶¶49, 53. Accordingly, Plaintiff's August 28, 2019 Complaint is timely, and I turn next to the merits.

2.     Plaintiff has Stated a Claim Under the NJLAD

Plaintiff's hostile work environment claim is based on the cumulative effect of the following

15

incidents and circumstances: employees' "free[]" use of derogatory slurs in the workplace; unwanted

sexual advances against Plaintiff, which in one situation was accompanied by derogatory language;

and Defendant's retaliatory actions against Plaintiff, including the fabrication of safety infractions

and the denial of bus routes, in response to Plaintiff's complaints to Ethics Point and the EEOC in

connection with the derogatory slurs and unwanted advances. *See* ECF No. 37 ¶67. Defendant moves

to dismiss Plaintiff's claim primarily on grounds that the derogatory slurs and unwanted advances,

by themselves, do not amount to a hostile work environment. ECF No. 38-1 at 15-17.

To state a hostile work environment claim under the NJLAD, Plaintiff must allege "that the

complained-of conduct (1) would not have occurred but for the employee's protected status, and was

(2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of

employment have been altered and that the working environment is hostile or abusive." *Shepard*, 174

N.J. at 24 (citing *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 603-04 (1993)).

In determining whether conduct is sufficiently severe or pervasive, courts must "look[] at all

the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775,

788 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[S]imple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to" severe or pervasive

conduct. *Id.*; *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). However, even where "many

of [a] plaintiff['s] allegations, standing alone, would be insufficient . . .," the allegations may be

sufficient to state a claim when "[v]iewed cumulatively." *Shepard*, 174 N.J. at 25-26. In *Shepard*,

the plaintiffs had protested against racially discriminatory treatment their supervisors had inflicted

on other employees, which led to a discrimination lawsuit against the supervisors. *Id.* at 8-9. The

plaintiffs alleged that their supervisors retaliated against them for supporting the lawsuit.

Specifically, the plaintiffs alleged that their supervisors made veiled comments threatening recrimination, gave Christmas presents to the entire staff except the plaintiffs, supervised the plaintiffs more critically than other employees, and exhibited general unfriendliness toward the plaintiffs. *Id.* at 9-15. In assessing whether these actions were "severe or pervasive," the Court noted that "many . . ., standing alone, would be insufficient to state a cause of action," but that "[v]iewed cumulatively," the allegations were "sufficient to present a hostile work environment claim to a jury." *Id.* at 26.

Here, Defendant does not appear to contest "that the complained-of conduct . . . would not have occurred but for [Plaintiff's] protected status" as a gay man. *Shepard*, 174 N.J. at 24. Indeed, Plaintiff alleges that "several derogatory words for homosexuals," including "faggot," "were used freely throughout the work floor"; that two different drivers made sexual advances toward Plaintiff and, in one instance, directed derogatory comments at him; that Plaintiff submitted complaints to the EEOC and Defendant's Ethics Point related to these incidents; and that Plaintiff thereafter experienced retaliation in the form of fabricated safety violations and the denial of bus routes. These allegations are sufficient to establish the first prong under *Lehmann* for purposes of Defendant's Motion to Dismiss.[7]

---

[7] There is no question that the derogatory slurs and unwanted sexual advances are sufficiently connected to Plaintiff's protected status. However, the connection between Defendant's retaliatory actions and Plaintiff's protected status is less clear. Plaintiff appears to allege that Defendant took these retaliatory actions in response to both his safety complaints and his complaints related to harassment based on his sexual orientation. Furthermore, Plaintiff's allegations suggest that Defendant did not resume its practice of denying bus routes to Plaintiff until approximately six months after Plaintiff submitted his complaint related to the derogatory slurs and unwanted sexual advances. ECF No. 37 ¶¶39, 62, 65. These facts may weaken the connection between Defendant's retaliatory actions and Plaintiff's protected status. Nevertheless, Defendant has not contested this element under *Lehmann*, and it is free to do so in a subsequent motion for summary judgment. For purposes of this Motion, Plaintiff has adequately alleged a sufficient connection between Defendant's retaliatory actions and his protected status as a gay man.

Plaintiff has also adequately alleged that the complained-of conduct was "severe or pervasive." *Shepard*, 174 N.J. at 24. Plaintiff alleges that "several derogatory words for homosexuals were used freely throughout the work floor," ECF No. 37 ¶60, suggesting that this language was used frequently and on a consistent basis. As one example, Plaintiff points to an employee's use of the word "faggot" over the radio system. *Id.* ¶ 63. He also claims that two different employees sexually propositioned him. *Id.* ¶¶62, 64. One did so persistently, *see id.* ¶62 (alleging that the driver "kept asking Plaintiff for sexual favors"), and the other used derogatory language against Plaintiff when he rebuffed the driver's advances. *Id.* Defendant argues that non-supervisory employees' use of slurs and sexual advances against Plaintiff, each taken in isolation, constitute "[s]imple teasing, offhand comments, and isolated incidents," which do not amount to "severe or pervasive" conduct. *Faragher*, 524 U.S. at 788; ECF No. 38-1 at 16-17. Yet, the Court must "look[] at all the circumstances." *Faragher*, 524 U.S. at 786-88. In addition to the slurs and sexual advances, Plaintiff alleges that he submitted a complaint related to these incidents to Ethics Point and the EEOC, in response to which Defendant allegedly took no corrective action and, instead, retaliated against Plaintiff. In the fall of 2016, Plaintiff's supervisors allegedly concocted safety violations against him, and following Plaintiff's objections, his supervisors again began refusing to assign him any bus routes beginning in the spring of 2017. ECF No. 37 ¶¶65-67. The latter action was particularly severe, as it prevented Plaintiff from earning wages throughout the summer of 2017. Considering the "cumulative effect of the[se] various incidents," *Lehmann*, 132 N.J. at 607, at the motion to dismiss stage, Plaintiff's allegations are sufficient to establish that Defendant's conduct was "severe" and "pervasive." *See Shepard*, 174 N.J. at 26 (concluding that persistent retaliatory action in response to plaintiffs' complaint regarding a racially hostile work environment were sufficiently "severe or pervasive" to state an NJLAD claim).

The parties dispute the applicability of *Taylor v. Metzger*, 152 N.J. 490 (1998), which held

that "a single utterance of an epithet can, under particular circumstances, create a hostile work environment." *Id.* at 501. In *Taylor*, an African American police officer brought a claim for racial harassment under the NJLAD based on allegations that the supervisor called her a "jungle bunny," a derogatory racial slur. *Id.* at 495, 498. The Court concluded the single use of this racial slur by a supervisor against his subordinate was "severe" enough to satisfy the *Lehmann* standard. *Id.* at 506-07; *cf. Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 181-82 (3d Cir. 2020) (school principal's references to teacher as "Mufasa," based on his middle name, Mostafa, and "Arabia Nights," not sufficiently severe or pervasive because, unlike *Taylor*, they did not involve "an unambiguous racial epithet," and they were "isolated incidents"). Here, however, Plaintiff has alleged more than the "single use" of a derogatory slur. Rather, Plaintiff has alleged that "several derogatory words for homosexuals were used freely throughout the work floor, including but not limited to the word 'faggot.'" ECF No. 37 ¶¶60-61, 63. He also alleges that he experienced unwanted sexual advances on multiple occasions, at least one of which involved derogatory language directed at him. *Id.* ¶¶62, 64. And, he alleges that when he complained about these incidences to Defendant, he experienced ongoing retaliation. Thus, whether the single use of a derogatory slur could support Plaintiff's claim has no relevance, although the use of the slur "faggot" could potentially qualify as "severe" conduct under *Taylor*.

Defendant cites to several other precedents establishing that isolated epithets do not constitute "severe or pervasive" conduct, but none address the circumstances at issue here, where Plaintiff has alleged the persistent use of derogatory slurs combined with retaliatory actions that effectively terminated his employment. For example, in *Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005), the plaintiff asserted a racially hostile work environment claim based on certain employees' use of racial epithets and expression of support for the Ku Klux Klan, as well as the placement of racist graffiti and flyers around the police department. *Id.* at 263. The court held that these comments and

actions, none of which were directed at the plaintiff, amounted to "offhand comments and isolated incidents" that were "insufficient[,] without more[,] to establish a hostile work environment." *Id.* (internal quotations omitted). However, unlike here, where Plaintiff personally experienced unwanted advances accompanied by derogatory language, "no racist comment . . . was ever directed at" the plaintiff in *Caver. Id.* at 263. Furthermore, *Caver* noted that these incidents combined with other actions, such as the plaintiff's allegations that his supervisors reported him for unnecessary psychological evaluations, could have established a sufficiently hostile environment. *Id.* at 264. Nevertheless, because a jury had already concluded in the context of the plaintiff's separate retaliatory discharge claim that the psychological evaluations were not racially motivated, the Court of Appeals declined to reverse the district court's decision—after two years of discovery—granting summary judgment to the defendant on the plaintiff's hostile work environment claim. *Id.* at 253, 263-64. *Caver* is distinguishable from this case, as it was decided on a motion for summary judgment after a jury had already ruled on certain allegations pertaining to racial hostility. *Id.* Furthermore, as *Caver* acknowledges, derogatory slurs in combination with other actions—such as the allegedly concocted safety violations and denial of bus routes, here—may establish a sufficiently hostile environment.[8]

Finally, Plaintiff has established that a "reasonable person [could] believe that . . . the conditions of employment have been altered and that the working environment [wa]s hostile or abusive." *Shepard*, 174 N.J. at 24. *Lehmann* adopted this "standard to exclude an 'idiosyncratic

---

[8] Defendant similarly cites to *Lulis v. Barnhart*, 252 F. Supp. 2d 172 (E.D. Pa. 2003), which concluded that nine incidents of unwanted sexual attention over seventeen months, many of which the court concluded were not in fact sexually suggestive, were not sufficiently severe or pervasive to establish a hostile work environment claim. *Id.* at 176-78. But, again, *Lulis* does not address the circumstances at issue, here, where Plaintiff has alleged that the frequent use of derogatory slurs and unwanted sexual advances, combined with persistent retaliation against him for complaining about these incidents, amounted to a hostile work environment.

response of a hypersensitive plaintiff.'" *Id.* at 26 (quoting *Lehmann*, 132 N.J. at 614). Here, Defendant does not argue that Plaintiff has exhibited an "idiosyncratic response" or that he has otherwise failed to satisfy this element. Indeed, Plaintiff could have reasonably believed that the conditions of his employment had been altered when, after complaining about the regular use of homophobic slurs and unwanted sexual advances, Defendant took retaliatory action against him by, *inter alia*, refusing to assign him any bus routes, thereby effectively depriving him of the ability to earn a living from his employment. *Cf. Lehmann*, 132 N.J. at 610 (concluding that plaintiffs need not prove economic loss to state a hostile work environment claim, thereby suggesting that economic loss resulting from defendant's actions could, nevertheless, contribute to such an environment). Plaintiff's allegations that he was "singled out for such treatment" reinforces his reasonable belief that Defendant's actions had altered the conditions of his employment. *Shepard*, 174 N.J. at 26; ECF No. 37 ¶53.

Under these circumstances, Plaintiff has adequately stated a claim under the NJLAD sufficient to survive Defendant's Motion to Dismiss.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint is **DENIED**. An appropriate form of Order is filed herewith.


Date: August 27, 2021                                    /s/ Freda L. Wolfson
                                                         Hon. Freda L. Wolfson
                                                         U.S. Chief District Judge