<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MILKO V. MATEO,<br><br>               Plaintiff,<br><br>    v.<br><br>FIRST TRANSIT INC.,<br><br>               Defendant. | Civil Action No. 19-17302 (GC) (DEA)<br><br>**OPINION** |

<u>**CASTNER, District Judge**</u>

This matter comes before the Court upon Defendant First Transit Inc.'s motion for summary judgment on Plaintiff Milko Mateo's Second Amended Complaint, under Federal Rule of Civil Procedure (Rule) 56.  (ECF Nos. 37, 72.)  Mateo opposed, and First Transit replied.  (ECF Nos. 75, 81.)  The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, First Transit's motion is **GRANTED**.

I.        <u>**BACKGROUND**</u>

A.        **Procedural Background**

Mateo filed suit pro se in August 2019 and amended his complaint in December 2019. (ECF Nos. 1, 10.)  Following First Transit's partially successful motion to dismiss the Amended Complaint, Mateo retained counsel and filed the Second Amended Complaint (SAC) asserting two claims: wrongful discharge under *Pierce v. Ortho Pharmaceutical Corp.*[1] (Count I); and hostile

_____

[1]        417 A.2d 505 (N.J. 1980).

work environment under the New Jersey Law Against Discrimination (NJLAD), N.J. Stat. Ann. § 10:5-1 et *seq.* (Count II).  (ECF Nos. 20, 27, 28, 32, 37.)  First Transit again moved to dismiss, which the Court denied.  (ECF Nos. 38, 44, 45.)[2]

After fact discovery closed, Mateo's counsel withdrew, and Mateo proceeded pro se.  (ECF Nos. 64, 65.)  First Transit then moved for summary judgment.  (ECF No. 72.)

### B.      Pro Se Leniency

Our local rules require opponents of summary judgment to submit "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion."  L. Civ. R. 56.1(a).  (ECF No. 75.) Instead of responding to First Transit's statement, Mateo submitted his own "Statement of Undisputed Material Fact."  (ECF No. 75 at 6.[3])  But Mateo never responded to First Transit's statement of facts, even though the Court gave him an opportunity to do so and advised him that "[a] material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."  (ECF No. 80 (quoting L. Civ. R. 56.1(a)).)

Typically, "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."  L. Civ. R. 56.1(a).  First Transit cites caselaw where courts strictly adhered to the consequences of not complying with Local Civil Rule 56.1(a).  (ECF No. 81 at 6.) *See  Webster  v.  Dollar  Gen.,  Inc.*, 197 F. Supp. 3d 692, 696 n.5 (D.N.J. 2016) ("The Court

---

[2]      For a detailed recitation of the procedural history, see *Mateo v. First Transit Inc.*, Civ. No. 19-17302, 2020 WL 4013547 (D.N.J. July 16, 2020), and *Mateo v. First Transit Inc.*, Civ. No. 19-17302, 2021 WL 3856288 (D.N.J. Aug. 30, 2021).

[3]      Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent) . . . ." (citing L. Civ. R. 56.1(a))); *Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth.*, Civ. No. 12-3427, 2014 WL 268652, at *5 n.4 (D.N.J. Jan. 23, 2014) ("[A]ny statement that is not explicitly denied with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted." (citing L. Civ. R. 56.1(a))).

The Court may, however, relax any local rule if adherence would result in injustice.  L. Civ. R. 83.2(b).  This case warrants relaxation.  Unlike the plaintiffs in the above cases, Mateo is pro se.  The Court will afford Mateo the leeway traditionally afforded to pro se litigants.  *See Townsend v. Cnty. of Mercer*, Civ. No. 22-4960, 2024 WL 866719, at *3 (D.N.J. Feb. 29, 2024) (relaxing L. Civ. R. 56.1(a)'s requirements for a pro se plaintiff).  To the extent that Mateo's factual assertions vary from those in First Transit's Rule 56.1 statement, the Court considers those facts to be disputed, and the balance of First Transit's factual assertions supported by the record will be deemed uncontested.  *See Townsend*, 2024 WL 866719, at *3.[4]

## C.     Facts Not In Dispute

On August 20, 2015, Mateo began working for First Transit as a full-time bus operator, or "driver," at its facility in New Brunswick, New Jersey, to provide bus services for Rutgers University.  (SAC ¶¶ 1-3; DSMF ¶ 1; PSMF 6.)

When his employment began, Mateo received and acknowledged First Transit's Employee Handbook.  (DSMF ¶ 2; PSMF 6; Silverman Ex. D, ECF No. 72-6.)  First Transit maintains a Harassment Free Workplace policy and an antidiscrimination policy.  (DSMF ¶ 3; PSMF 6.)  Under these policies, First Transit states that it "is committed to providing a work environment

---

[4]     First Transit's Local Civil Rule 56.1 statement of material facts (DSMF) is at ECF No. 73-31; Mateo's supplemental statement of material facts (PSMF) is at ECF No. 75 at 6-21.

free of harassment" and prohibits "[h]arassment because of . . . sexual orientation" and "unlawful harassment by any employee of [First Transit]." (DSMF ¶ 4; PSMF 6; Silverman Cert. Ex. C, ECF No. 72-5 at 5-6.) First Transit also maintains a Policy Against Retaliation setting forth a reporting procedure for addressing internal complaints of retaliation as well as an employee hotline to report anonymously complaints of discrimination, harassment, or retaliation. (DSMF ¶ 5; PSMF 6; ECF No. 72-5 at 7-8.)

As a driver, Mateo was a covered employee under a collective bargaining agreement. (DSMF ¶ 6; PSMF 6; Beyers Cert. Ex. A, ECF No. 72-30 (CBA);[5] *see* Pl. Dep. 98:20-24 (testifying that as a bus operator he was subject to a CBA).[6]) The CBA provides for a seniority system in route assignments—Article 14(D), entitled *Route Assignments*, states, "Qualified employees may bid on available routes and work assignments in the order of seniority when posted for bid by the Company." (DSMF ¶ 7; CBA, Art. 14; *see also* Pl. Dep. 50:4-23 (testifying that routes are assigned by seniority).) Under Article 10, *Discipline*, the CBA states, "The Company shall not discipline an employee who is no longer in his or her probationary period without just cause," and "[t]he Company recognizes the general concept of progressive discipline." (DSMF ¶ 9; CBA, Art. 10.) The CBA also has a Grievance and Arbitration policy for "disputes between the parties concerning the meaning, interpretation, application or alleged violation by the Company of the written terms of" the CBA. (DSMF ¶ 10; PSMF 7; CBA, Arts. 11, 14.)

---

[5]     Mateo's opposition papers include the same CBA. (*See* ECF No. 75-4.)

[6]     Excerpts of Mateo's deposition transcript in the summary-judgment record are at ECF Nos. 72-3 and 75-2.

1.     <u>Allegations of Discrimination</u>

Mateo alleges that he was discriminated against and subject to sexual harassment due to his sexual orientation.  (SAC ¶¶ 1, 59-64; DSMF ¶ 11; PSMF 20; Pl. Dep. 54:2-14, 55:15-20.)[7]

***Comments and gestures.***  Mateo testified that before August 2016, a fellow bus operator named here as Employee-W, who was not Mateo's supervisor, "ma[de] passes at" him "three to four times."  (DSMF ¶ 13; SAC ¶¶ 62, 64; Pl. Dep. 65:24-66:2, 67:16-18.)  At his deposition, Mateo "c[ould]n't quite explain the way [Employee-W] was asking things."  (Pl. Dep. 70:10-11.)  Mateo recalled two times when Employee-W "comment[ed] about [Employee-W's] anatomy"— that "he didn't have a large penis"—and then "just literally" ran away.  (DSMF ¶¶ 15-6; Pl. Dep. 70:21-71:19.)  These were the extent of Employee-W's comments that Mateo perceived as sexual advances; Employee-W did not use any negative slurs about Mateo's sexual orientation.  (DSMF ¶ 16; Pl. Dep. 74:1-8, 76:15-24.)  Mateo also estimates that Employee-W made "about two to three" non-verbal gestures toward Mateo, though he could not describe any of the alleged gestures.  (DSMF ¶ 17; Pl. Dep. 74:18-75:21.)  Mateo testified that no one else at First Transit made any sexual advances toward him.  (DSMF ¶ 18; Pl. Dep. 75:22-76:7.)

Asked if Employee-W's conduct affected Mateo's ability to complete his job, Mateo testified:

---

[7]     First Transit implies that its management did not know Mateo's sexual orientation.  (*See* DSMF ¶ 12 (noting Mateo's testimony that First Transit knew that he was gay "based on [his] own assumption and perception of [his] own mannerisms" (citing Pl. Dep. 58:16-59:1, 60:6-24).)  To the extent that First Transit's knowledge of Mateo's sexual orientation is disputed, the Court resolves the dispute in Mateo's favor for purposes of this summary-judgment motion.  (*See* Pl. Dep. 77:9-10 ("Everyone knew that I was gay.  It was no secret.").)  This favorable inference also applies to the alleged knowledge of Mateo's coworkers, to the extent that knowledge is disputed. (*See* DSMF ¶ 14 (noting Mateo's testimony that he "does not have any information, other than his own belief," demonstrating that a specific coworker "knew that Mateo was gay" (citing Pl. Dep. 69:18-22, 77:7-23).)

> Yes, because I have a man who is actually being annoying at this point, and I said that earlier today.  I said he's -- the way that he's going about, the way that he's trying to ask me certain things, it actually gets to the point where it's just annoying.  You know, if [Employee-W] probably had spoken to me directly, and I would have been, like, no, I'm not interested, that would have been done and dealt with right there, and I would have not even made a complaint to anybody.  But it was just the way he kept going about it, the way he kept going on, it was the annoying part.  It was just how annoying it got, so to this point I'm just getting frustrated.

[(Pl. Dep. 105:1-21.)]

Despite the annoyance, Mateo testified that he could drive his bus route without issue despite Employee-W's conduct, he never went home early because of Employee-W's conduct, he never called out of work because of Employee-W's conduct, and he could not recall missing a shift because of Employee-W's conduct.  (DSMF ¶ 19; Pl. Dep. 105:22-106:14.)

***Derogatory slur.***  Mateo also alleges that another fellow driver named here as Employee-M, who also was not Mateo's supervisor, abruptly yelled the word "faggot" while conversing about the scheduling paddle (the clipboard holding the schedule) over the radio with his dispatcher, Hale Kim.  (SAC ¶ 63; DSMF ¶ 20; Pl. Dep. 80:19-81:13.)  When a trainer Maria Thomas later accused Mateo of saying the slur, Mateo corrected her that Employee-M said it, to which Thomas responded: "Oh.  I thought it was you," and walked away, according to Mateo.  (DSMF ¶¶ 21-23; Pl. Dep. 81:14-82:17.)  Mateo was not disciplined for the incident.  (DSMF ¶ 24; Pl. Dep. 82:18-21.)

The only "sexual-orientation-based comment[]" that Mateo recalls hearing at First Transit was Employee-M's alleged single use of the derogatory slur over the radio.  (Pl. Dep. 82:22-83:16.)  Mateo testified that Employee-M did not direct the slur at Mateo.  Mateo also does not believe that Employee-M said the slur because Mateo was gay, or that Thomas asked him about the comment because he was gay.  (DSMF ¶ 25; Pl. Dep. 83:6-84:5, 102:17-23.)  Mateo also testified that

6

overhearing the comment did not affect his ability to complete his job duties.  (DSMF ¶ 26; Pl.

Dep. 106:15-18.)

        2.     <u>Allegations of Retaliation</u>

**Verbal warning.**  As a bus driver at Rutgers, Mateo had to follow certain "Radio Etiquette"

and "Do's and Don'ts" for operational and safety performance, including policies and guidelines

as to how drivers must act over the radio—for example, "[b]e polite on the radio," "[w]atch your

tone," "[d]on't take your frustration over the radio," and "[r]adio communication violations are

taken seriously and will be addressed"—and how drivers must interact with passengers.  (DSMF

¶ 28; Pl. Dep. 48:4-49:25; Silverman Cert. Exs. G-I, ECF Nos. 72-9 to 72-11.)

On February 15, 2016, while driving his bus on his assigned route, Mateo radio-contacted

the operations supervisor Hale Kim to report that his windshield was fogging up because the

defroster was not working properly.  (DSMF ¶ 27; PSMF 9, 16; Pl. Dep. 129:1-13.)  Though Kim

told Mateo to "load and go," i.e., "continue picking up students and going," Mateo felt that it was

too unsafe to drive, so he pulled over the bus half-full of students, got out, and called Kim from

his cellphone.  (DSMF ¶ 29; PSMF 16; Pl. Dep. 132:2-133:20; Silverman Cert. Ex. F, ECF No.

72-8.)  When Kim insisted that Mateo continue driving, Mateo hung up, reentered the bus, and

told the students: "Listen, you guys are hearing most of the conversation that is going on . . . .  I'm

not going to put your lives in danger or myself. . . .  If you guys can call and make a complaint,

that would be helpful."  (DSMF ¶ 30; Pl. Dep. 134:6-19.)

Kim promptly reported the incident to management, detailing the radio-exchange with

Mateo and Mateo's interactions with bus passengers.  (DSMF ¶ 31; PSMF 9; Silverman Cert. Ex.

F, ECF No. 72-8.)  When Mateo returned from his shift, operations manager Jose Vega met with

Mateo to discuss the incident, issuing Mateo a Notice of Verbal Warning for his "radio etiquette." (DSMF ¶ 32; PSMF 9, 16; Silverman Cert. Ex. J, ECF No. 72-12.)

*Extra shifts.*  Mateo alleges that after the February 15 incident, Vega would not provide Mateo with extra bus-route shifts.  (DSMF ¶ 33; Pl. Dep. 153:8-24; SAC ¶ 12.)  Mateo estimates that this happened on three or four occasions sometime between March 2016 and May 2016. (DSMF ¶ 34; Pl. Dep. 155:15-18, 156:4-6, 157:14-16, 176:23-177:5.)  According to Mateo, the operations manager would disregard the assignment-by-seniority requirement under the CBA when awarding these extra shifts.  (Pl. Dep. 157:14-22, 161:9-25; *see* CBA, Art. 14.D.)  Still, Mateo never complained to the operations manager or anyone else in management about not getting open routes.  (Pl. Dep. 159:8-160:10.)  At his deposition, Mateo vaguely recalled that by the third denial, he may have stopped bidding for extra routes.  (Pl. Dep. 160:3-7.)  And despite knowing that the routes were covered by the CBA, Mateo never filed any grievances regarding the awarding of these routes, reasoning that the union "was never really . . . very helpful" and would likely say "it's based on seniority."  (DSMF ¶¶ 35-36; Pl. Dep. 161:6-162:12.)

On February 25, 2016, Mateo filed a complaint through the Ethicspoint hotline, a resource that fields employee complaints and routs them to management.  (DSMF ¶ 37; PSMF 16; Pl. Dep. 168:19-25; Silverman Cert. Ex. K, ECF No. 72-13 at 2.)  First Transit's human resources department investigated Mateo's complaints and "found no violations of policy or procedure," according to an Ethicspoint report.  (DSMF ¶ 38; ECF No. 72-13 at 3.)

On March 3, Mateo filed another Ethicspoint hotline complaint alleging that the operations manager was not providing him with an extra route due to Mateo's February 15 reporting of the defroster issue.  (DSMF ¶ 39; ECF No. 72-13 at 3.)  After a review of the information submitted, HR concluded that this was "a workplace issue that can be resolved using the grievance procedure

outlined within [Mateo's] collective bargaining agreement."  (DSMF ¶ 40; ECF No. 72-13 at 4.)
Mateo never filed a grievance concerning these extra routes.  (DSMF ¶ 41; Pl. Dep. 161:9-11).

Between March 14 and April 14, Mateo filed another three Ethicspoint hotline complaints,
mainly alleging that his supervisor was withholding extra routes from him in retaliation for his
past complaints.  (DSMF ¶ 42; Silverman Cert. Exs. L-M, O, ECF Nos. 72-14, 72-15, 72-17.)  HR
concluded that the first complaint should be resolved through the CBA's grievance process (ECF
No. 72-14 at 4), the second was "[u]nsubstantiated" (ECF No. 72-15 at 4), and the third lacked
enough information to facilitate an investigation (ECF No. 72-17 at 4).

Mateo testified that there were times that he received extra shifts after the February 2016
complaint.  (DSMF ¶ 44; Pl. Dep. 231:15-20.)

***Written warning.***  On October 24, 2016, Mateo operated his standard bus route.  (DSMF
¶ 45; Pl. Dep. 240:18-241:4.)  At First Transit, drivers must inspect their vehicles at the beginning
and end of their shifts.  (DSMF ¶ 46; Pl. Dep. 238:19-22, 247:13-19.)  After finishing his shift on
October 25, around 3:00 a.m., Mateo submitted his driver vehicle inspection report (DVIR) to the
dispatcher without updating it after completing his route.  (DSMF ¶ 47; Pl. Dep. 235:22-236:4,
242:5-12, 242:22-24, 243:3-5.)  Shortly after Mateo left for the night, the fueler on duty and the
dispatcher discovered "severe damage" to Mateo's recently returned bus—the bus's rear tires were
blown out, shredded, and nearly off the rim.  (Silverman Cert. Ex. Q, Guellette Dep. 22:6-16, ECF
No. 72-19; Silverman Cert. Ex. R, ECF No. 72-20.)  At 3:47 a.m., the dispatcher emailed various
management personnel, including the safety supervisor, about the incident.  (DSMF ¶ 49; Guellette
Dep. 40:9-22; Silverman Cert. Ex. R, ECF No. 72-20.)  The safety supervisor then spoke with the
dispatcher to begin the process of investigating the incident.  (DSMF ¶ 50; Silverman Cert. Ex. S,
Kelly Dep. 16:24-17:23, ECF No. 72-21.)

On October 26, after speaking with the general manager about his findings, the safety supervisor issued Mateo a Written Warning, which included pictures of the shredded tires, for failure to perform a proper post-trip vehicle inspection in violation of company policy. (DSMF ¶ 51; Kelly Dep. 20:16-21:1; Silverman Cert. Ex. T, ECF No. 72-22.) Mateo refused to sign the Written Warning, denying that he was responsible for the damage. (DSMF ¶ 52; Pl. Dep. 246:14-247:9; Silverman Cert. Ex. T, ECF No. 72-22.)

On October 31, Mateo filed an Ethicspoint hotline complaint about the "[u]nfair disciplinary action." (Silverman Cert. Ex. U, ECF No. 72-23 at 3.) Upon investigating, HR "found no violations of policy or procedure," while also confirming that this was "a workplace issue that can be resolved by using the grievance procedure outlined within [Mateo's] collective bargaining agreement." (DSMF ¶ 54; Silverman Cert. Ex. U, ECF No. 72-23 at 4.) Mateo appealed the discipline by filing a grievance with the union, claiming that the written warning was "fraudulent." (DSMF ¶ 55; Pl. Dep. 247:24-249:10, 254:16-18, 257:6-19.)

After receiving the Written Warning, Mateo continued driving his shift for the remainder of the semester. (DSMF ¶ 57; Pl. Dep. 254:19-255:4.) Mateo testified that he may have also received extra shifts during the past fall semester, but he could not recall. (DSMF ¶ 57; Pl. 255:5-11.) Mateo worked the 2017 spring semester after receiving a call from the scheduling supervisor offering him a schedule for the spring semester. (DSMF ¶ 59; Pl. Dep. 264:3-8, 266:24-267:10, 271:13-21.) This call came after another of Mateo's Ethicspoint hotline complaints concerning another slashed tire in January 2017. (DSMF ¶ 60; Pl. Dep. 271:13-21.) Mateo drove for the spring 2017 semester without issue. (DSMF ¶ 71; Pl. Dep. 282:2-3.)

In May 2017, Mateo obtained a job with Ahold Ecommerce, a delivery company, delivering groceries to customers' homes. (DSMF ¶ 61; Pl. Dep. 264:9-17.) Mateo did not reach

out to First Transit's scheduler for a summer shift; instead, that summer Mateo worked for Ahold. (DSMF ¶ 62; Pl. Dep. 268:18-25.)  Mateo reasoned that the scheduler "didn't call me, and I wasn't obligated in working the summer either," noting that drivers commonly took long summer vacations, adding, "then I got hired with Ahold, so I ended up working the summer with Ahold Ecommerce."  (Pl. Dep. 268:18-25.)

In June 2017, Mateo, First Transit management, and the union met to discuss Mateo's grievance about the Written Warning.  (DSMF ¶ 58; Pl. Dep. 259:2-260:21.)  Mateo testified that during the meeting, the attendees insisted that Mateo let the union representative be Mateo's spokesperson, until the end when they invited Mateo's input.  (Pl. Dep. 259:8-260:16.)  According to Mateo, the meeting left the matter unresolved, and management could not say how much longer its investigation would take.  (Pl. Dep. 260:17-21.)

Mateo alleges that as of August 25, 2017, he was not contacted about a route for the fall semester.  (DSMF ¶ 63; Pl. Dep. 276:2-9, 283:10-12.)

On August 15, Mateo emailed HR Director, Kristy Baccile, stating, "I want to forward to you a statement regarding a matter that happened at first transit in new brunswick nj rutgers." (DSMF ¶ 64; Silverman Cert. Ex. W, ECF No. 72-25.)  That same day, Baccile referred Mateo to his Region HR Manager, Brad Byers, to assist with Mateo's matter.  (DSMF ¶ 65; Silverman Cert. Ex. W, ECF No. 72-25.)  On September 5, Mateo emailed Byers, providing details of the October 2016 Written Warning and the alleged January 2017 tire incident.  (DSMF ¶ 66; Silverman Cert. Ex. W, ECF No. 72-25 at 3.)

Mateo testified that in August or early September 2017, he and Byers spoke on the phone.[8]

(Pl. Dep. 274:1-17, ECF No. 81-2.)  As to their discussion about the fall schedule, Mateo recalled:

> MATEO.  [W]hen I asked him for a schedule, he asked me, "What do you want me to do about it?" and that's when I realized -- I'm, like, okay, I guess they had fired me or something; and they didn't say anything to me about it.
>
> ATTORNEY.  What is Mr. Brad Byers' role?
>
> A.  I believe he's a regional human resources.
>
> Q.  Is it your understanding that human resources has anything to do with scheduling?
>
> A.  No, but if I didn't get a schedule from Mr. -- he's the right person that I should have spoken to if I didn't get a schedule for the summer -- I mean for the winter or for the fall semester . . . .
>
> [(Pl. Dep. 274:13-25.)]

On September 5, 2017, Mateo submitted his resignation letter.  (DSMF ¶ 68; Pl. Dep. 278:19-279:6, 287:13-23; Silverman Cert. Ex. X, ECF No. 72-26.)  Mateo claims that he was constructively discharged and was forced to submit the resignation letter on September 5 when he did not receive a shift for the fall semester.  (DSMF ¶ 69; Pl. Dep. 278:19-280:24, 287:13-23.) Though agreeing that "nobody at First Transit ever said that [he was] terminated," Mateo testified:

> [B]ut what would come to anyone's mind when you are waiting for a schedule to start your employment, and every other employee is already working?  There is nothing else there but to say to yourself, well, okay, well, they terminated me.  But they haven't said one word to me about it.
>
> [(Pl. Dep. 280:12-24, 283:3-6.)[9]]

---

[8]     Though Mateo cites his August 15 email to support that he reached out to Baccile and Byers in August 2017 and "requested a schedule for the" fall 2017 semester (PSMF 14 (citing "Mateo Exhibit P275," ECF No. 75-27 at 11)), Mateo's August 15 and September 5 emails do not mention the driving shifts for the fall semester (DSMF ¶ 67).

[9]     First Transit submits that "Mateo testified that he believes he was terminated based on his own perception of events," citing Mateo's deposition transcript at 280:16 to 281:3.  (DSMF ¶ 70.)

Mateo did not contact the scheduler or the scheduler's manager to request a schedule, did not follow up in July or August to seek a schedule for the fall semester, and did not contact the union about not receiving a schedule for the fall semester.  (DSMF ¶¶ 72-73; Pl. Dep. 276:2-9, 283:10-12, 295:3-6; *see* ECF No. 75 at 14 ("Mateo . . . was waiting to be called to be able to choose a schedule for the September semester school years of 2017.").)  At the time that Mateo submitted his resignation letter, he had received only one written warning, which was still in the grievance process.  (DSMF ¶ 74; Pl. Dep. 285:14-16.)  Mateo testified that he did not feel that First Transit threatened him in any way other than the one written warning.  (Pl. Dep. 285:14-20.)  He also testified that he could not "provide any specific facts or support" of the fraud that he alleged in his resignation letter.  (DSMF ¶ 75; Pl. Dep. 285:21-286:6.)  And Mateo confirmed that he continued working for First Transit for at least six months after the alleged fraudulent tire incident and safety complaint.  (DSMF ¶ 76; Pl. Dep. 291:11-14.)

After leaving First Transit, Mateo completed Section II of an Unemployment Form, which instructs applicants to complete "if you voluntarily left your job for other employment."  (DSMF ¶ 77; Silverman Cert. Ex. V, ECF No. 72-24 at 3.)  Indeed, Mateo testified that nobody at First Transit ever told Mateo he was terminated.  (DSMF ¶ 78; Pl. Dep. 280:12-15; *see also* ECF No. 75 at 15 ("Mateo wasn't told that he had been terminated without possibility of rehire.").)

## II.   <u>LEGAL STANDARD</u>

Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there

---

But that factual assertion is not substantiated by page 280 of Mateo's deposition transcript, and page 281 of the transcript was not included in First Transit's submission, so the Court cannot verify First Transit's assertion.

is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)). "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

## III.   **DISCUSSION**

Mateo alleges that he suffered two types of workplace misconduct that created a hostile work environment and led to his constructive discharge: (1) he was subjected to unwanted sexual advances by one coworker and a homophobic slur used by another coworker;[10] and (2) in retaliation for his internal complaints, he was denied extra routes and issued unfair warnings. (SAC ¶¶ 59-85; *see generally* ECF No. 75.)

### A.   **LMRA § 301 Preemption**

First Transit argues that Mateo's claims are preempted by Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185.[11]

"Section 301(a) of the LMRA provides for federal jurisdiction over disputes regarding collective bargaining agreements." *Medley v. Atl. Exposition Servs., Inc.*, 550 F. Supp. 3d 170, 191 (D.N.J. 2021) (citing 29 U.S.C. § 185(a)). But "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301 or

---

[10]    Mateo included the derogatory-slur allegation in the SAC, though he did not mention it at all in his opposition papers. (*Compare* SAC, *with* ECF No. 75.) Still, the summary-judgment record is developed on that allegation, so the Court will consider it here.

[11]    Mateo did not address this preemption issue in his opposition papers.

other provisions of the federal labor law." *Id.* (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985)).  "LMRA § 301 completely preempts a state cause of action only when the resolution of said action is 'substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract.'" *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 305 (3d Cir. 2014) (quoting *Lueck*, 471 U.S. at 220).

The LMRA does not "preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Naples v. New Jersey Sports & Exposition Auth.*, 102 F. Supp. 2d 550, 553 (D.N.J. 2000) (quoting *Lueck*, 471 U.S. at 212).  "Only state law claims inextricably intertwined with considerations of the terms of the labor contract are preempted by [LMRA]." *Id.* (citation and internal quotation marks omitted).  That analysis is done on a "case by case basis." *Medley*, 550 F. Supp. 3d at 192 (quoting *Lueck*, 471 U.S. at 213, 220).  The "dispositive question" for LMRA preemption is "whether [plaintiff's] state claims require any *interpretation* of a provision of the CBA." *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 256 (3d Cir. 2004); *see also Medley*, 550 F. Supp. 3d at 192 ("The relevant inquiry is whether 'resolution of Plaintiff's claim . . . require[s] "interpretation" of the [relevant] CBA,' or at least will 'involve a substantial issue of construction and operation of the CBA.'" (quoting *LaResca v. Am. Tel. & Tel.*, 161 F. Supp. 2d 323, 331 (D.N.J. 2001)) (some quotation marks omitted)).  Indeed, "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409-10 (1988).  A "purely factual inquiry," which "does not turn on the meaning of any provision of a

15

collective-bargaining agreement," does not trigger preemption.  *Id.* at 407; *Hejda v. Bell Container Corp.*, 160 A.3d 741, 753 (N.J. Super. Ct. App. Div. 2017).

Mateo alleges that First Transit wrongfully (1) denied him extra routes despite his seniority, (2) verbally reprimanded him for poor radio etiquette, (3) issued him a "fraudulent" written warning for vehicle damage that he did not cause, and (4) did not give him a route schedule for the 2017 fall semester—all in retaliation for his internal complaints of sexual harassment and safety hazards.  (*See* ECF No. 72-1 at 23 (citing Mateo's deposition testimony).)

First Transit asserts that the CBA expressly covers Mateo's challenges to First Transit's route assignments and disciplinary actions: "Article 14 of the CBA specifically applies to . . . Route Assignments"; "the CBA's grievance procedure applies to 'disputes between the parties concerning the . . . application or alleged violation by [First Transit] of the written terms of' the CBA," such as Mateo's claim that First Transit disregarded the "seniority processes in the CBA . . . when awarding extra shifts"; and Articles 10 and 11 of the CBA, which set forth procedures for discipline and grievances, cover Mateo's allegations that he received a "fraudulent" written warning.  (ECF No. 72-1 at 23.)  In fact, First Transit contends, Mateo's filing a grievance for the written warning constitutes an admission that the CBA covers the disciplinary action.  (*Id.*)

The Court disagrees with First Transit.  None of Mateo's claims requires interpreting the CBA.  The decision in *Labree v. Mobil Oil Corp.*,[12] which First Transit chiefly relies on, does not support a different outcome.  In *Labree*, the court found § 301 preemption because the plaintiff's wrongful discharge claim required resolving whether the CBA contained "an implied promise to provide light duty positions to those employees who were injured"—"a question of contract interpretation."  692 A.2d at 543-44.  That finding aligns with the Court's preemption finding in

---

[12]     692 A.2d 540, 543 (N.J. Super. Ct. App. Div. 1997).

*Medley*, where the plaintiffs could not "demonstrate discrimination without first determining whether [they] were entitled to pension contributions" under the CBA—the main allegation of their NJLAD claim.  550 F. Supp. 3d at 196-97.  Because the plaintiffs in *Medley* alleged that the employer had to make pension contributions under the CBA and for discriminatory reasons did not do so, "if pension contributions were not required, [the employer]'s failure to make those contributions may not be an adverse employment action."  *Id.* at 197.  In both *Labree* and *Medley*, the parties disputed the plaintiffs' rights under the CBA, and the resolution of those disputes would turn on the meaning of the CBA's terms.

No such dispute exists here.  Mateo claims that First Transit retaliated against him by not awarding him extra shifts and manufacturing bogus disciplinary actions.  That claim does not concern the meaning of the CBA's seniority provision or any other term.  Though First Transit may counter that it did in fact assign routes based on employees' seniority in accordance with the CBA, that defense involves a "purely factual inquiry" that "does not turn on the meaning of any provision of a collective-bargaining agreement."  *Lingle*, 486 U.S. at 407; *see Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 266 (1994) ("[W]hether the employer's actions make out the element of discharge under [the state's wrongful-discharge] law . . . is a 'purely factual question.'" (quoting *Lingle*, 486 U.S. at 407)).  Indeed, "[r]eferences to, or considerations of, the terms of a collective-bargaining agreement are not the equivalent of interpreting the meaning of the terms.  If they were, all discrimination actions brought by unionized employees would be preempted because the starting point for every case would have to be the agreement."  *Coefield v. Jersey Cent. Power & Light Co.*, 532 F. Supp. 2d 685, 697 n.8 (D.N.J. 2007).  Therefore, Mateo's claims are not preempted by LMRA § 301.

**B.  Wrongful Discharge (Count I)**

1.  *Pierce* Claim

Under New Jersey common law, "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce*, 417 A.2d at 512.  To establish a *Pierce* claim, a plaintiff must identify a clear mandate of public policy and that the discharge itself was in violation of that public policy. *Myers v. Advanced Stores Co. Inc.*, Civ. No. 19-18183, 2020 WL 2744632, at *6 (D.N.J. May 27, 2020) (citing *Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1183 (N.J. 2008)).  The plaintiff must also prove causation: that the plaintiff was in fact terminated because of protected activity and not some other reason. *Murray v. Cnty. of Hudson*, Civ. No. 17-2875, 2023 WL 6785081, at *13 (D.N.J. Oct. 13, 2023) (citing *House v. Carter-Wallace, Inc.*, 556 A.2d 353, 359 (N.J. Super. Ct. App. Div. 1989), where the court found that an asserted connection between the plaintiff's opposition to a corporate act and his discharge three months later was "wholly speculative").

Mateo's *Pierce* claim fails for two reasons.  First, Mateo labels his employment termination as a "constructive discharge," as opposed to claiming that First Transit fired him.  (SAC ¶ 78.) Mateo alleges that his "constructive discharge occurred as no reasonable person could continue in the current situation, specifically the continuing retaliation which included the harassment as well as the refusal to provide any routes"—allegations resembling those in support of his NJLAD claim. (*Id.*)  To the extent that Mateo relies on NJLAD violations for the public-policy element of his *Pierce* claim, that reliance is impermissible for establishing a *Pierce* claim. *See Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 73 (3d Cir. 1996) ("Because the sources of public policy [plaintiff] relies on are coterminous with his statutory claims, he cannot advance a separate common law public policy claim."); *Powell v. Advancing Opportunities*, Civ. No. 22-00525, 2023

18

WL 4866349, at *7 (D.N.J. July 31, 2023) ("In the context of [NJLAD] claims, . . . a wrongful

termination claim based on the same policy as the statutory claim is preempted by the statute."

(collecting cases)). ｜

    Second, even if First Transit had fired Mateo,[13] no reasonable jury could find that it was

because of his complaints about violations of motor vehicle safety regulations—the non-NJLAD

public policy that Mateo cites for his *Pierce* claim.[14]  (SAC ¶ 14; ECF No. 75 at 15, 19-20.)  Mateo

cites only two times when he reported alleged violations of safety regulations—on February 15,

2016, when Mateo reported the defective defroster, and January 12, 2017, when Mateo refused to

drive a bus with a damaged tire.  (ECF No. 75 at 16, 18.)  Yet Mateo presents nothing from which

---

[13]    The record overwhelmingly establishes not that Mateo was terminated but that he resigned. The SAC alleges that First Transit's conduct left "him no choice but to give notice of his constructive discharge." (SAC ¶ 53; *see id.* ¶ 78 (describing his termination as "constructive discharge").) Mateo later testified that he sent First Transit a resignation letter when he did not receive a shift for the fall semester, and that nobody at First Transit ever told him that he was terminated. (DSMF ¶ 78; Pl. Dep. 278:19-280:24, 287:13-23; Silverman Cert. Ex. X, ECF No. 72-26.) Mateo completed Section II of his Unemployment Form, which requires completion only if the applicant "voluntarily left" his or her job. (DSMF ¶ 77; Silverman Cert. Ex. V, ECF No. 72-24 at 3.) And in his opposition papers, Mateo confirms that First Transit never told him that he was terminated. (*See* ECF No. 75 at 10, 15.)

    Still, Mateo points to First Transit's internal record dated September 1, 2017, which notes the reason for Mateo's termination as his "fail[ure] to return from summer leave," though the template form that First Transit used categorizes that reason for termination as involuntary. (ECF No. 75-27 at 16.) Mateo contends that the document proves that he was in fact fired. The Court finds that discrepancy does not create a genuine issue of material fact for trial on Mateo's *Pierce* claim. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 585, 592 (3d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). And "when a party alleges facts that are blatantly contradicted by the record," the Court "will 'not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Gillispie*, 892 F.3d at 592 (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007)). Although Mateo enjoys all reasonable factual inferences at this stage, his assertion is contradicted by his own deposition testimony and representations that he voluntarily left First Transit. No reasonable juror could find otherwise.

[14]    The Court does not decide whether the asserted regulations qualify as the requisite public policy for a *Pierce* claim.

the Court could infer favorably for him that even the most recent report—more than seven months before Mateo's employment with First Transit ended—led to any form of his termination with First Transit. *See Badrinauth v. MetLife Corp.*, 368 F. App'x 320, 324 (3d Cir. 2010) ("A claim for wrongful termination under *Pierce* may be dismissed on grounds that the lack of temporal proximity between the protected activity and the adverse employment action belies a causal connection." (citing *House*, 556 A.2d at 359)); *Mitchell v. C & S Wholesale Grocers, Inc.*, Civ. No. 10-2354, 2010 WL 2735655, at *8 (D.N.J. July 8, 2010) (dismissing a *Pierce* claim whose proof of causation was only that the plaintiff was terminated sometime after he complained to the Department of Labor). For both reasons, Mateo's *Pierce* claim cannot proceed.

### 2.   Constructive Discharge Claim

A constructive discharge occurs when an employer engages in "'severe or pervasive' conduct . . . that is so intolerable . . . a reasonable person would be forced to resign rather than continue to endure it." *Shepherd v. Hunterdon Developmental Ctr.*, 803 A.2d 611, 628 (N.J. 2002) (quoting *Jones v. Aluminum Shapes, Inc.*, 772 A.2d 34, 44 (N.J. Super. Ct. App. Div. 2001)); *see Toto v. Princeton Twp.*, 962 A.2d 1150, 1156 (N.J. Super. Ct. App. Div. 2009) ("A constructive discharge claim is more difficult to prove than a hostile work environment claim . . . ."). "[T]he standard envisions a 'sense of outrageous, coercive and unconscionable requirements.'" *Shepherd*, 803 A.2d at 628 (quoting *Jones*, 772 A.2d at 44). The heightened standard for proof of a constructive discharge claim also recognizes an employee's "obligation to do what is necessary and reasonable in order to remain employed rather than simply quit." *Id.* at 627 (citation omitted). The proofs required to establish a constructive discharge are objective: whether a "reasonable person" would have resigned. *Id.* at 628; *see also Muench v. Twp. of Haddon*, 605 A.2d 242, 249 (N.J. Super. Ct. App. Div. 1992) (noting the "reasonable person" test in constructive discharge

cases).  "A trial court should consider the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances."  *Shepherd*, 803 A.2d at 627 (citation omitted).

When viewing the facts in a light most favorable to Mateo, the Court finds that he cannot meet the very high standard for proving a constructive discharge claim.  First, nothing in the record reflects conduct by First Transit that objectively was so "intolerable" or "outrageous, coercive and unconscionable" that a "reasonable person" would feel "forced to resign."   Take all of the complained-of conduct in a light favorable to Mateo: First Transit issued him a verbal warning for encouraging students to complain about a bus malfunction even though he had reported a safety hazard; Mateo was sometimes denied extra shifts and sometimes awarded them; First Transit "fraudulently" issued him a Written Warning for not reporting severe tire damage that he says he was not responsible for; a coworker made sexual advances and lude comments and gestures toward Mateo on a handful of occasions, which Mateo described as "annoying" (Pl. Dep. 105:1-21); another coworker once abruptly yelled a derogatory slur over the radio, which Mateo says neither was directed at him nor affected his ability to work; Mateo was asked about the slur and was never reprimanded for it; and Mateo did not receive the "customary phone call to notify" him about the fall 2017 semester schedule (ECF No. 75 at 8, 16).  No reasonable jury could find that the complained-of conduct rises to the very high level of intolerability necessary to constitute a constructive discharge.

Second, the undisputed record makes clear that Mateo did not "do what is necessary and reasonable in order to remain employed rather than simply quit."  *Shepherd*, 803 A.2d at 627. Mateo testified that he never contacted the scheduler to request a schedule for the fall 2017

semester, nor did he contact a union representative about not receiving a schedule.  Instead, Mateo

only called HR for a schedule in August 2017, even though Mateo says HR has nothing to do with

scheduling.  And when HR could not provide a schedule, Mateo "guess[ed] they had fired [him]

or something."  (Pl. Dep. 274:13-25.)  Mateo's minimal efforts to continue working at First Transit

cannot satisfy the standard necessary for a constructive discharge claim.  Therefore, Mateo's

constructive discharge claim cannot proceed.

### C.       Hostile Work Environment Under NJLAD (Count II)

For his hostile work environment claim,[15] Mateo must establish that the complained-of

conduct (1) would not have occurred but for his sexual orientation, and it was (2) severe or

pervasive enough to make a (3) reasonable person of the same sexual orientation in Mateo's

position believe that (4) the conditions of employment are altered and the working environment is

hostile or abusive.  *Rios v. Meda Pharm., Inc.*, 252 A.3d 982, 987 (N.J. 2021) (citing *Lehmann v.

Toys R Us, Inc.*, 626 A.2d 445, 453 (N.J. 1993)).  "Whether conduct is 'severe or pervasive'

involves 'an assessment of the totality of the relevant circumstances,'" including "(1) the

frequency of all the discriminatory conduct; (2) its severity; (3) whether it is physically threatening

or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an

employee's work performance."  *Church v. Sears Holding Corp.*, 605 F. App'x 119, 125 (3d Cir.

2015) (quoting *Godfrey v. Princeton Theological Seminary*, 952 A.2d 1034, 1045 (N.J. 2008)).

For its analysis, the Court assumes that Mateo can establish the first element of a hostile

work environment claim.  Based on the record, however, no reasonable jury could find that the

---

[15]       Though the SAC asserts an NJLAD claim based only on a hostile work environment due
to Mateo's sexual orientation, Mateo's opposition papers characterize his claims as ones for
retaliation.  (*Compare* SAC ¶¶ 80-85, *with* ECF No. 75 at 20.)  Mateo "may not amend his
complaint through arguments in his brief in opposition to a motion for summary judgment."  *Bell
v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008).

work environment was severe or pervasive.  In support of his claim, Mateo cites Employee-W's lude comments and gestures and Employee-M's use of a derogatory slur.

As to Employee-W's conduct, Mateo's testimony was unequivocal: he considered the conduct to be merely annoying.  But "only speech or conduct that is sufficiently severe or pervasive to create a hostile or intimidating working environment constitutes unlawful sexual harassment." *Paige v. Atrion Commc'n Res., Inc.*, Civ. No. 17-00472, 2019 WL 5846799, at *6 (D.N.J. Nov. 7, 2019) (citing New Jersey Model Civil Jury Charge 2.25 (revised Mar. 2016)); *see also Herman v. Coastal Corp.*, 791 A.2d 238, 251 (N.J. Super. Ct. App. Div. 2002) ("Although a person is legally entitled to a work environment free of hostility, she is not entitled to a perfect workplace, free of annoyances and colleagues she finds disagreeable.  In short, what is illegal is a 'hostile work environment,' not an 'annoying work environment.'" (citation omitted)).

Next is Employee-M's one-time use of a derogatory slur over the radio.  Mateo testified that he does not believe that Employee-M said the slur because Mateo was gay, or that Thomas asked him about the comment because he was gay, nor did his overhearing the comment affect his ability to complete his job duties.  (DSMF ¶ 25; Pl. Dep. 83:6-84:5, 102:17-23.)  In fact, that use of the slur was the only "sexual-orientation-based comment[]" that Mateo recalls hearing at First Transit.  (Pl. Dep. 82:22-83:16.)  That isolated incident, having no discernable effect on Mateo's work, cannot sustain a hostile work environment.  *See Tavares v. Builders FirstSource Ne. Grp., Inc.*, Civ. No. 21-02964, 2023 WL 4248770, at *5 (D.N.J. June 29, 2023) (dismissing a hostile work environment claim where plaintiff could not show that "sporadic . . . racial remarks" "were made against him or were sufficiently serious that they could be said to have created a culture that negatively altered the terms of his employment").

Therefore, Mateo's hostile work environment claim cannot proceed.

IV.     **CONCLUSION**

For the reasons set forth above, and other good cause shown, First Transit's motion for summary judgment is **GRANTED**, and Mateo's complaint is **DISMISSED**.  An appropriate Order follows.

Dated: March 28, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE